[L.A. No. 31551. July 1, 1982.]

COLONIAL LIFE & ACCIDENT INSURANCE COMPANY,
Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
LOUISE PERRY, as Administratrix, etc., Real Party in Interest.

786

**COUNSEL**

Adams, Duque & Hazeltine, James L. Nolan, Kimberly W. Shaller, Cosgrove, Cramer, Rindge & Barnum and L. P. McElhaney for Petitioner.

No appearance for Respondent.

Darryl Leemon for Real Party in Interest.

**OPINION**

**KAUS, J.—**

I

Colonial Life & Accident Insurance Company (Colonial) petitions for a writ of mandate to bar real party in interest (plaintiff) Louise Perry from discovering the names, addresses, and records of certain

Colonial claimants or, in the alternative, to place certain restrictions on plaintiff's use of the material discovered. We must reject Colonial's arguments and therefore deny the petition.

This proceeding arose from an action brought against Colonial and its claims adjusters, Equifax Inc. and J. T. Sharkey, for violation of Insurance Code section 790.03, subdivision (h), breach of contract, and breach of the duty of fair dealing and good faith.[1] Plaintiff, administratrix of the estate of Luella Burton, seeks general and punitive damages based on defendants' conduct in attempting to settle a claim made by Burton under an accident policy issued by Colonial.

The events giving rise to Burton's claim may be summarized briefly. Burton, a teacher, was attending a PTA meeting when a student allegedly stepped on her big toe. Within two weeks, she was hospitalized for progressive infectious gangrene; her foot, and eventually her entire leg, were amputated. Burton contacted Colonial on her release from the hospital.

Contending that the amputation was not covered by Burton's policy, Colonial, through Equifax and Equifax's employee, Sharkey, allegedly offered Burton $1,500 as full settlement of her claim, contingent upon her surrender of the policy. Burton refused the offer, demanding the maximum applicable benefit under the policy: $10,000. Burton died on October 22, 1980, without receiving any benefits.

A complaint was filed by plaintiff on March 13, 1981. Four months later, she served Equifax with a request to inspect and copy all documents pertaining to cases handled by Sharkey while employed by Equifax.[2] Equifax refused to supply this information, basing its objection on Insurance Information and Privacy Protection Act (Ins. Code, § 791.01 et seq.), "overbreadth" and relevancy considerations.[3] On a

---

[1]Sharkey and Equifax are named only in the statutory cause of action. (See *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 576 [108 Cal.Rptr. 480, 510 P.2d 1032].)

[2]Plaintiff also presented three narrower requests for documents containing: (1) information of every "settlement assignment" handled by Sharkey while employed by Equifax, (2) information of every "settlement assignment" handled by Sharkey for Colonial while employed by Equifax, and (3) information of every case handled by Sharkey for Colonial while employed by Equifax.

[3]Defendants raised no claim of attorney-client privilege with regard to the discovery of their files. (Cf. *D. I. Chadbourne, Inc.* v. *Superior Court* (1964) 60 Cal.2d 723, 736-738 [36 Cal.Rptr. 468, 388 P.2d 700].)

motion to compel discovery, the trial court ordered Equifax to produce the names and addresses of all persons whose claims for benefits under Colonial's policies were assigned Sharkey for settlement—about 35 in all—and approved a letter to be sent by plaintiff's counsel to these individuals requesting that they consent to the release of their records by Equifax.[4] The court expressly prohibited the parties and counsel from initiating any contact with nonparty insurance claimants pending their response to the letter.[5] No restraint was placed on any party regarding claimants who responded to the letter.

On November 9, 1981, the trial court issued an additional protective order preventing plaintiff's counsel from disclosing to any other person the names, addresses or records of nonparty claimants or from "making use thereof except for preparation for trial and trial in this action." The order was requested and prepared by counsel for Equifax.

Shortly after the November 9, 1981, protective order was issued, Colonial filed a motion to "clarify" the order. The suggested "clarifications" would have barred plaintiff's counsel from "communicating, directly or indirectly with . . . other claimants, except for a letter seeking consent from such other claimants to disclosure of Equifax records in a form previously approved by the Court." Colonial also submitted an alternative clarifying order barring plaintiff's attorney from "seeking employment from . . . other claimants . . . in any action against" or "encouraging . . . other claimants to file any lawsuit" against Colonial, Equifax or Sharkey. At a hearing on November 20, 1981, Colonial argued that these additional restrictions were necessary to prevent plaintiff's attorney from soliciting new clients from those who respond to the letter. The trial judge rejected both "clarifying" orders, expressing doubts about his power to impose such restrictions consistent with the First Amendment and suggesting that the proposed orders would prohibit conduct which would be otherwise permissible under the Rules of Professional Conduct of the State Bar.

Colonial now seeks a writ of mandate explicitly preventing plaintiff's counsel from seeking to represent other claimants against Colonial, Equifax or Sharkey. Colonial also argues for a writ barring all discov-

---

[4]Colonial does not contend that the discovery ordered by the trial court was embarrassing or oppressive. (Code Civ. Proc., § 2019, subd. (b)(1).)

[5]Defendants were, however, permitted to contact claimants in connection with pending claims.

ery of the names and records of such claimants on the ground, inter alia, that evidence of a "pattern of unfair practices" is irrelevant as a matter of law in private actions against insurers under Insurance Code section 790.03, subdivision (h). To preserve the issue, we issued an alternative writ requiring plaintiff's attorney to return the disputed list of names and addresses, and barring him from any further contact with those named in the list. We now reject Colonial's contentions and, accordingly, dissolve the alternative writ.

## II

Colonial's suggestion that the discovery of other insureds whose claims were negotiated by Sharkey will not yield relevant, admissible evidence, is patently meritless. Under Code of Civil Procedure section 2031, subdivision (a), any party may request another party to produce documents "which are relevant to the subject matter of the action, or are reasonably calculated to discover admissible evidence . . . ." Production of such documents may be compelled upon a showing of good cause (Code Civ. Proc., § 2034, subd. (a)).[6] As we explained in *Pacific Tel. & Tel. Co.* v. *Superior Court* (1970) 2 Cal.3d 161, 173 [84 Cal.Rptr. 718, 465 P.2d 854], "the relevance of the subject matter standard must be reasonably applied; [fn. omitted] in accordance with the liberal policies underlying the discovery procedures, doubts as to relevance should generally be resolved in favor of permitting discovery [fn. omitted; citation omitted] . . . . An appellate court cannot reverse a trial court's grant of discovery under a 'relevancy' attack unless it concludes that the answers sought by a given line of questioning cannot as a reasonable possibility lead to the discovery of admissible evidence or be helpful in preparation for trial."[7]

Insurance Code section 790.03, subdivision (h) prohibits insurers from "knowingly committing *or performing with such frequency as to indicate a general business practice*" a variety of "unfair claim settlement practices." (Italics added.) Despite the language of the statute,

---

[6]Good cause is defined by Code of Civil Procedure section 2036, subdivision (a) as "specific facts justifying discovery and [a showing] that the matter is relevant to the subject matter of the action or reasonably calculated to lead to the discovery of admissible evidence." Thus, the burden of showing the need for discovery was on plaintiff in the first instance. This requirement was amply met by an affidavit accompanying the motion to compel discovery.

[7]We also noted that an objection to a trial court's grant of discovery on relevancy grounds "generally will not support the issuance of an extraordinary writ." (*Pacific Tel. & Tel. Co.* v. *Superior Court, supra*, at p. 170, fn. 11.)

Colonial suggests that in an action by a private litigant under section 790.03, subdivision (h), evidence of a general business practice is irrelevant as a matter of law. This contention is based in part on a passage in *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880, 891 [153 Cal.Rptr. 842, 592 P.2d 329], in which we stated that "to an aggrieved private litigant who can demonstrate that the insurer acted deliberately, the frequency of the insurer's misconduct and its application to others is irrelevant."[8] That statement, however, was made in the context of rejecting an insurance company's claim that a third party claimant may not base an action against an insurer under section 790.03, subdivision (h) on a *single instance* of unfair conduct, but rather *must* show a continuing course of conduct. Holding that a single knowing violation was sufficient, we noted: "There would be no rational reason why an insured or a third party claimant injured by an insurer's unfair conduct, knowingly performed, should be *required* to demonstrate that the insurer had frequently been guilty of the same type of misconduct involving other victims in the past." (*Id.*, at p. 891; italics added.)

The language of the statute and *Royal Globe* clearly indicate that a plaintiff may establish a claim by showing either that the acts that harmed him were knowingly committed or were engaged in with such frequency as to indicate a general business practice. While proof of a knowing violation will make plaintiff's job that much easier, in cases where a knowing violation is difficult to establish, knowledge can be proved circumstantially. (See also Evid. Code, § 1101, subd. (b).) Discovery aimed at determining the frequency of alleged unfair settlement practices is therefore likely to produce evidence directly relevant to the action.

Other instances of alleged unfair settlement practices may also be highly relevant to plaintiff's claim for punitive damages. (See, e.g.,

[8]Colonial also argues that "public policy requires that a private right of action be implied only in cases where it is necessary, as ... where a plaintiff will have no [other] remedy," and that, even if we construe *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329], to imply a private right of action in these circumstances, "this court should only imply a private right of action in cases where there has been a knowing violation as to plaintiff...." Since this case is before us on a discovery matter, not on demurrer, Colonial's contentions are misplaced. As we noted in *Pacific Tel. & Tel. Co.* v. *Superior Court* (1970) 2 Cal.3d 161, 172-173 [84 Cal.Rptr. 718, 465 P.2d 854] "[C]ourts may appropriately give the applicant [for discovery] substantial leeway, especially when the precise issues of the litigation of the governing legal standards are not clearly established [citation]; a decision of relevance for purposes of discovery is in no sense a determination of relevance for purposes of trial. [Fns. omitted.]"

*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal. Rptr. 691, 620 P.2d 141], cert. den. (1980) 445 U.S. 912 [63 L.Ed.2d 597, 100 S.Ct. 1271].) Punitive damages must be based on a showing of "oppression, fraud, or malice." (Civ. Code, § 3294.) To be liable for punitive damages, defendant must act """"with the intent to vex, injure, or annoy, *or with a conscious disregard of the plaintiff's rights.* [Citations.]""" (*Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 895 [157 Cal.Rptr. 693, 598 P.2d 854]; *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980]; *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462 [113 Cal.Rptr. 711, 521 P.2d 1103].) ■ These elements may be proven directly or by implication. (*Neal, supra,* at p. 923, fn. 6; *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 65-66 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

■ Indirect evidence of the elements of punitive damages may be suggested by a pattern of unfair practices. In *Neal, supra,* for example, we affirmed an award of punitive damages based on a failure to settle where the evidence indicated that defendant insurance company's refusal "to accept [plaintiff's] offer of settlement, and its subsequent submission of the matter to its attorney for opinion, [fn. omitted] were all part of a conscious course of conduct, firmly grounded in established company policy . . . ." (At p. 923.) Similarly, in *Delos* v. *Farmers Insurance Group* (1979) 93 Cal.App.3d 642, 664 [155 Cal.Rptr. 843], hearing denied August 29, 1979, the court upheld an award of punitive damages based in part on "an inextricable involvement with conduct aptly described . . . as a 'nefarious scheme to mislead and defraud thousands of policyholders' with defendants' decision to deny [plaintiff's] claim." (See also *Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339, 352-353 [87 Cal.Rptr. 226].)[9]

■ Without doubt, the discovery of the names, addresses and files of other Colonial claimants with whom Sharkey attempted settlements is relevant to the subject matter of this action and may lead to admissible evidence.[10]

---

[9]Furthermore, evidence regarding Sharkey's previous dealings may be relevant to prove ratification or authorization by Equifax and Colonial of his alleged unfair acts. This proof may also be relevant to the issue of punitive damages. (See *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at pp. 822-823.)

[10]Colonial also complains that revealing information about other claimants "carries a tremendous potential for violation of . . . privacy, which section 791.13 of the Insur-

## III

■ Alternatively, Colonial urges that we grant a writ of mandate requiring the trial court to "specifically prohibit [plaintiff's] counsel from seeking employment from all persons whose claims to benefits under a Colonial insurance policy were handled by Sharkey in any action ⋅... or encouraging the nonparty claimants to file any lawsuit against Colonial, Equifax or Sharkey." The trial court's refusal to grant a "clarifying" order to this effect was not an abuse of discretion. We decline to issue the requested writ.

Colonial is apparently concerned about two related but distinct problems: (1) that plaintiff's attorney will improperly solicit clients from those who contact him pursuant to the letter approved by the trial court; and (2) that even if plaintiff's lawyer does not solicit clients, he may "stir up" litigation ·by suggesting to other claimants that they have legitimate claims.

Rule 2-101(B), Rules of Professional Conduct of the State Bar, states: "No solicitation or 'communication' seeking professional employment from a potential client for pecuniary gain shall be delivered by a member or a member's agent in person or by telephone to the potential client, nor shall a solicitation or 'communication' specifically directed to a particular potential client regarding that potential client's particular case or matter and seeking professional employment for pecuniary gain be delivered by any other means, unless the solicitation or 'communication' is protected from abridgement by the Constitution of the United States or by the Constitution of the State of California." Contrary to Colonial's assertion, there is no indication on this record that plaintiff's attorney plans to engage in, or has engaged in solicitation in violation of this section.[11] The "communication" involved here is not for the purpose

ance Information and Privacy Protection Act, Insurance Code section 791.01 et seq., is designed to protect." Section 791.13 prevents an insurance company from disclosing "any personal or privileged information about an individual collected or received in connection with an insurance transaction...." However, it contains a number of exceptions, one of which permits the insurance company to release this information "[w]ith the written authorization of the individual ... [i]f such authorization is ... (A) Dated; (B) Signed by the individual[;] (C) Obtained one year or less prior to the date a disclosure is sought ...." The procedure for contacting other claimants approved by the trial court should satisfy these requirements if the authorization form, included in the letter sent to claimants, is returned within a year.

[11]Colonial maintains that plaintiff's attorney "tacitly admitted that he was interested in promoting lawsuits by the non-party claimants against Colonial and Equifax and that he thought he was the best attorney to represent these non-party claimants." This

of "seeking professional employment for pecuniary gain" but for the purpose of developing relevant evidence in an existing lawsuit. "It is, of course, entirely proper in multiple-claimant accidents for an attorney representing one victim to call on others in the course of investigation and development of evidence." (1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, § 223, p. 235; see *Ashe* v. *State Bar* (1969) 71 Cal.2d 123, 133 [77 Cal.Rptr. 233, 453 P.2d 737].) Similarly, it is proper in this context for plaintiff's attorney to contact other Colonial claimants through the procedure devised by the trial court. We cannot join in Colonial's assumption that, when faced with an opportunity to solicit clients in the course of legitimate discovery, plaintiff's attorney will ignore his ethical obligations.

Moreover, the trial court's restrictions on discovery more than adequately addressed Colonial's concern. The court barred plaintiff's counsel from contacting other claimants until those claimants responded to a court-approved letter. In addition, the court's November 9 protective order barred plaintiff's attorney from disclosing or publishing the names, addresses or files discovered, and from "making any use thereof except for preparation for trial and trial in this action." These restrictions appear to bar any direct solicitation of clients using these materials.

We agree with the trial court's determination that the provisions of the "clarifying" order barring plaintiff's attorney from encouraging litigation already go beyond the scope of actions punishable under the Rules of Professional Conduct.[12] Rule 2-101 specifically provides that,

---

accusation is based in part on plaintiff's attorney's observation during the hearing on the proposed clarifying orders that, because of his experience with this suit, he would be well prepared to try other cases against Equifax and Sharkey. However, these comments were made in the course of explaining why other claimants against Colonial should not be prohibited from hiring him *if they chose to*. He explicitly acknowledged his ethical obligation not to engage in improper solicitation.

[12]Referring to the "Kutak Report" (ABA Com. on Evaluation of Prof. Standards, Model Rules of Prof. Conduct (proposed final draft May 30, 1981) rule 7.3), the court cited a trend toward the relaxation of rules barring the acceptance of employment resulting from unsolicited legal advice. Colonial now suggests that the trial court misread the "Kutak Report" and that, in any event, the report's recommendations have not been adopted in California. The matter is entirely collateral since we conclude the trial court correctly observed that the proposed clarifying order, by preventing plaintiff's attorney from giving *solicited* advice even when *un*associated with the acceptance of employment, went far beyond *existing* disciplinary rules.

notwithstanding its limitations on solicitation, "nothing in . . . subdivision (B) shall limit or negate . . . a member's right to respond to inquiries from potential clients." To the extent that plaintiff's attorney, on request, provides information to other claimants which causes them to "recognize legal problems," his behavior is laudable. (See, e.g., ABA Code of Prof. Responsibility, EC 2-2.) If, however, he steps over the line and accepts employment resulting from unsolicited advice, his behavior may be punished. (See *Kitsis* v. *State Bar* (1979) 23 Cal.3d 857, 864 [153 Cal.Rptr. 836, 592 P.2d 323].)[13] Once again, there is no evidence that improper conduct has taken place or will occur, and there is no reason why the trial court should be compelled, by writ of mandate, to issue a protective order barring both permissible and impermissible behavior.

Even if the protective order suggested by Colonial barred only conduct prohibited by the Rules of Professional Conduct, we cannot see why the trial court should be compelled to make such an order. Obviously, the rules that govern professional responsibility apply whether or not they are restated by the trial court. Appropriate sanctions exist to enforce disciplinary rules. To require that the trial court independently enforce the rules governing the bar in every discovery matter would heap a tremendous additional burden on those courts, and, in our view, unwisely complicate matters.

Since we conclude that the trial court's refusal to grant the "clarifying" order was not an abuse of discretion, we need not consider whether granting the proposed order would have violated the First Amendment rights of plaintiff's attorney.

---

[13]The line between helping laymen to "recognize legal problems" and improper solicitation is, of course, a fine one. EC 2-3 of the American Bar Association Code of Professional Responsibility suggests a useful standard in this regard: "The advice [to seek legal services] is proper only if motivated by a desire to protect one who does not recognize that he may have legal problems or who is ignorant of his legal rights or obligations. It is improper if motivated by a desire to obtain personal benefit, secure personal publicity, or cause legal action to be taken merely to harass or injure another. A lawyer should not initiate an in-person contact with a non-client, personally or through a representative, for the purpose of being retained to represent him for compensation." Here, the purpose of contacting nonparty claimants is clearly to further plaintiff's case. To the extent that a secondary benefit may accrue to plaintiff's attorney, we can only observe that plaintiff's interest in obtaining this information must be paramount. (Cf. *Zarate* v. *Younglove* (C.D.Cal. 1980) 86 F.R.D. 80, 97-99.)

The petition for writ of mandate is denied and the alternative writ discharged.

Bird, C. J., Mosk, J., Richardson, J., Newman, J., Broussard, J., and Reynoso, J., concurred.