[No. B199631. Second Dist., Div. Seven. Jan. 15, 2008.]

JASON PUERTO et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
WILD OATS MARKETS, INC., Real Party in Interest.

1244

COUNSEL

Law Offices of Stephen Glick, Stephen Glick; Daniels, Fine, Israel, Schonbuch & Lebovits, Scott A. Brooks, Dennis J. Sinclitico, Jr.; Law Offices of Ian Herzog and Ian Herzog for Petitioners.

No appearance for Respondent.

Jackson Lewis, Frank M. Liberatore, Aryn J. Sobo, Debra N. Ibrahim and Sherry L. Swieca for Real Party in Interest.

## OPINION

**ZELON, J.**—Petitioners Jason Puerto, Jeffrey Armstrong, Thomas J. Baer, Charles Allen Schreck, Kelvin Nettleton, John Heim, Dennis Tucker, and Christopher Michael Williamson filed suit against their former employer, Wild Oats Markets, Inc., alleging wage and hour violations. During discovery, the trial court partially granted a motion to compel Wild Oats to provide the telephone numbers and addresses of individuals previously identified by name by Wild Oats in response to a form interrogatory, adopting a procedure to protect their privacy by sending a notice that would have required those individuals to fill in a postcard authorizing a third party administrator to disclose their addresses and phone numbers to petitioners. We conclude that the opt-in notice unduly hampers petitioners in conducting discovery to which they are entitled by erecting obstacles that not only exceed the protections necessary to adequately guard the privacy rights of the employees involved but also exceed the discovery protections given by law to far more sensitive personal information. Based on this conclusion, we hold that the trial court abused its discretion, and grant the writ.

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioners worked in Wild Oats stores. In October 2006, they filed suit against Wild Oats alleging, inter alia, unlawful nonpayment of overtime compensation, failure to compensate for all hours worked, and unfair business practices. Petitioners' claims arose from their alleged misclassification as exempt employees.

A. *Discovery Request*

In October 2006, each petitioner served written discovery on Wild Oats that included Judicial Council of California Form Interrogatory No. 12.1 (Form Interrogatory No. 12.1), which requested that Wild Oats: "State the

name, ADDRESS, and telephone number of each individual: [¶] (a) who witnessed the INCIDENT or the events occurring immediately before or after the INCIDENT; [¶] (b) who made any statement at the scene of the INCIDENT; [¶] (c) who heard any statements made about the INCIDENT by any individual at the scene; and [¶] (d) who YOU OR ANYONE ACTING ON YOUR BEHALF claim has knowledge of the INCIDENT (except for expert witnesses covered by Code of Civil Procedure section 2034)." The capitalized terms were defined in the interrogatory definitions. "INCIDENT" was defined as "The alleged claims, events and causes of action set forth in plaintiff's complaint." "YOU OR ANYONE ACTING ON YOUR BEHALF" included "you, your agents, your employees, your insurance companies, their agents, their employees, your attorneys, your accountants, your investigators, and anyone else acting on your behalf." The term "ADDRESS" was defined to mean "the street address, including the city, state, and zip code."

### B.  *Wild Oats's Responses*

Wild Oats initially responded to each petitioner's Form Interrogatory No. 12.1 as follows: "Defendant objects to this Interrogatory on the grounds it is vague and ambiguous; it seeks information and materials which are not relevant nor reasonably calculated to lead to the discovery of admissible evidence; it seeks information and materials protected from disclosure by the attorney-client privilege and attorney work-product doctrine; and it seeks information and materials protected from disclosure by the right to privacy of third-party non-litigants pursuant to Article I, Section 1 of the California Constitution. [¶] Subject to and without waiving the foregoing objections in any way, Defendant responds: Depending on how Plaintiff defines 'INCIDENT,' various co-workers of Plaintiff, whose identities are known to him, may be witnesses."

In January 2007, Wild Oats served its first supplemental responses to the form interrogatories. In these responses, Wild Oats stated, "Without waiving the foregoing objections, and to the extent not objected to therein, Defendant further responds as follows," and then provided the names and positions of what we understand to be many or all of the people who worked with petitioners while they were classified as exempt employees in Wild Oats stores. Somewhere between 2,600 and 3,000 names and positions were disclosed in the responses to Form Interrogatory No. 12.1 for the eight petitioners.

### C.  *Subsequent Proceedings*

The parties met and conferred, but reached an impasse about whether Wild Oats was obligated to disclose the named individuals' telephone numbers and

addresses. Petitioners filed a motion to compel further responses to the form interrogatories, seeking disclosure of the addresses and telephone numbers of the persons previously identified by Wild Oats; alternatively, they requested that the court establish an opt-out method for alerting the individuals that the information had been requested. Wild Oats opposed the motion in its entirety, but as an alternative proposed an opt-in procedure for notifying the affected employees of the request for their addresses and telephone numbers.

On hearing the motion, the trial court granted the motion to compel, with specific directions. The court instructed the parties to develop a procedure by which the individuals previously identified by Wild Oats in response to Form Interrogatory No. 12.1 would receive letters notifying them of petitioners' counsel's request for their addresses and telephone numbers, and would have to consent to the disclosure in writing. The trial court subsequently approved a process by which a third party administrator would send a letter to each of the affected individuals informing them of petitioners' request for their address and phone number in conjunction with petitioners' litigation. The letter continued, "The court has ordered the parties to send this letter to you so that you may decide whether or not you wish to disclose this information to the Plaintiffs' attorneys. If you consent to the disclosure of your contact information, please complete and return the enclosed postcard to the Third-Party-Administrator . . . ." The trial court's protective order also required that both petitioners and Wild Oats be informed of who responded to the letter, and precluded Wild Oats from encouraging or discouraging responses to the inquiry letter or participation in the litigation.

Petitioners filed the instant petition for writ of mandate and sought an immediate stay. This court ordered the requested stay and later issued an order to show cause why the order adopting the opt-in notice should not be rejected in favor of disclosure of the requested contact information with appropriate safeguards to protect the individuals' privacy concerns.

## DISCUSSION

### I. *Background and Applicable Law*

#### A. *At Issue: Identified Percipient Witnesses*

Petitioners sought the names and contact information of witnesses pursuant to Form Interrogatory No. 12.1. Wild Oats disgorged a massive list of names of employees who worked with petitioners at Wild Oats, but refused to provide contact information on the ground that the employees' right to privacy would be compromised.

Apparently mindful of the fact that the right to privacy in contact information is unlikely to trump petitioners' right to investigate their claims by contacting witnesses, Wild Oats vigorously argues that the population whose information is sought by petitioners cannot be characterized as witnesses. Taking this position requires Wild Oats to assert that the individuals it identified under oath in response to discovery are not potential witnesses: Wild Oats insists it "*never* said the individuals whose names and job titles it would produce were percipient witnesses." Wild Oats thus finds itself in the position of arguing before this court that its verified supplemental response to Form Interrogatory No. 12.1 was not in fact a responsive answer to the interrogatory requesting the identification of those Wild Oats knew or claimed were percipient witnesses but instead a grossly overbroad and nonresponsive general list of employees.[1] Were that in fact the case, then Wild Oats's supplemental discovery response would likely merit sanctions for "[m]aking an evasive response to discovery" or "[e]mploying a discovery method in a manner or to an extent that causes . . . oppression, or undue burden and expense." (Code Civ. Proc., § 2023.010, subds. (f), (c).) Wild Oats cannot escape the significance of its disclosure of the list of employees and job titles as a supplemental response to Form Interrogatory No. 12.1, which seeks the identification of those people Wild Oats knows or claims to be percipient witnesses. By offering their names and job titles in response to that interrogatory, Wild Oats necessarily identified the many individuals listed therein as people whose identities were responsive to the interrogatory—i.e., individuals it knew or believed to be potential witnesses. This is, therefore, a very basic discovery dispute: In order to obtain the locations of identified witnesses, petitioners moved to compel Wild Oats to give a full response to Form

---

[1] Wild Oats claims it "agreed to supplement its responses [to the form interrogatories] to provide the names and job titles of individuals who worked with Petitioners while Petitioners worked in exempt positions during the relevant time period. The purpose of this disclosure was to facilitate the identification of actual percipient witnesses. [¶] Petitioners were to review the list and identify those they claim have or may have percipient knowledge of their work habits." Wild Oats submitted to this court a letter its counsel sent to petitioners during the meet-and-confer process in which Wild Oats agreed to supplement its interrogatory responses. The parties clash over the document's admissibility, but that dispute is irrelevant here because neither that letter nor counsel's appellate declaration as to Wild Oats's purpose in disclosing the information establishes any agreement by the parties to dispense with Wild Oats's responsibility to provide responsive answers to the interrogatories propounded and to replace discovery with a system in which Wild Oats would provide a list of names from which plaintiffs could select individuals' names for some kind of further discussion. Wild Oats may have wanted to impose such a system, but the record is devoid of any indication that petitioners agreed to it, and we are skeptical that counsel for petitioners would accept such opponent-imposed limitations on their discovery rights. Indeed, the record also includes a subsequent meet-and-confer letter from petitioners' counsel requesting that Wild Oats fully respond to the interrogatories by providing the last known addresses and telephone numbers for the individuals identified, suggesting that no such agreement was reached.

Interrogatory No. 12.1 by providing addresses and telephone numbers to accompany the witness names that Wild Oats had already released.

### B. *Applicable Law*

In response to Form Interrogatory No. 12.1, Wild Oats identified approximately 2,600 witnesses, but refused to tell petitioners how to find them. Petitioners have a statutory entitlement to the contact information for these witnesses. Code of Civil Procedure[2] section 2017.010 provides that unless the court imposes limits, "any party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action or to the determination of any motion made in that action, if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence." "The scope of discovery is very broad" (*Tien v. Superior Court* (2006) 139 Cal.App.4th 528, 535 [43 Cal.Rptr.3d 121]), and it includes the right to "obtain[] . . . the identity and location of persons having knowledge of any discoverable matter . . . ." (§ 2017.010.)

■ The "expansive scope of discovery" (*Emerson Electric Co. v. Superior Court* (1997) 16 Cal.4th 1101, 1108 [68 Cal.Rptr.2d 883, 946 P.2d 841] (*Emerson*)) is a deliberate attempt to "take the 'game' element out of trial preparation" and to "do away 'with the sporting theory of litigation—namely, surprise at the trial.' " (*Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 376 [15 Cal.Rptr. 90, 364 P.2d 266] (*Greyhound*); see also *Garamendi v. Golden Eagle Ins. Co.* (2004) 116 Cal.App.4th 694, 712, fn. 8 [10 Cal.Rptr.3d 724] [discovery process is "designed to eliminate the element of surprise"].) One key legislative purpose of the discovery statutes is "to educate the parties concerning their claims and defenses so as to encourage settlements and to expedite and facilitate trial." (*Emerson*, at p. 1107.) The discovery procedures are also "designed to minimize the opportunities for fabrication and forgetfulness." (*Glenfed Development Corp. v. Superior Court* (1997) 53 Cal.App.4th 1113, 1119 [62 Cal.Rptr.2d 195].) Consistent with these purposes, our Supreme Court has often stated that discovery statutes are to be construed broadly in favor of disclosure, so as to uphold the right to discovery whenever possible. (*Greyhound*, at pp. 377–378; *Emerson*, at pp. 1107–1108.) "Matters sought are properly discoverable if they will aid in a party's preparation for trial." (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 987 [118 Cal.Rptr.2d 715].)

■ Central to the discovery process is the identification of potential witnesses. "The disclosure of the names and addresses of potential witnesses

---

[2] Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

is a routine and essential part of pretrial discovery." (*People v. Dixon* (2007) 148 Cal.App.4th 414, 443 [56 Cal.Rptr.3d 33] [applying Civil Discovery Act (§ 2016.010 et seq.) in context of sexually violent predator proceeding].) Indeed, our discovery system is founded on the understanding that parties use discovery to obtain names and contact information for possible witnesses as the starting point for further investigations: "The Civil Discovery Act also provides that a party may obtain information by the use of various methods, including oral and written depositions. (Code Civ. Proc., § 2020.010, subd. (a).) The party's ability to subpoena witnesses presumes that he has the witnesses' contact information." (*Dixon*, at p. 443.) One glance at the form interrogatories approved by the Judicial Council, particularly the interrogatories in the 12.0 series, demonstrates how fundamentally routine the discovery of witness contact information is. These standard form interrogatories request the names, addresses, and telephone numbers of witnesses to the relevant incident, persons possessing tangible objects relevant to the investigation, and persons who have been interviewed or given statements about the incident, or made a report or investigation of the incident. (Judicial Council of Cal., Form Interrogatory Nos. 12.1–12.7.)

█ While it is very broad, the right to discovery is not absolute, particularly where issues of privacy are involved. The right of privacy in the California Constitution (art. I, § 1), "protects the individual's *reasonable* expectation of privacy against a *serious* invasion." (*Pioneer Electronics (USA), Inc. v. Superior Court* (2007) 40 Cal.4th 360, 370 [53 Cal.Rptr.3d 513, 150 P.3d 198] (*Pioneer*).) While there are many different phrasings of the analysis that is performed when a discovery request seeks arguably private information, the constant theme among the decisions is that in deciding whether to permit discovery that touches upon privacy, "California courts balance the public need against the weight of the right." (*Denari v. Superior Court* (1989) 215 Cal.App.3d 1488, 1501 [264 Cal.Rptr. 261].) Drawing this ultimate balance requires a careful evaluation of the privacy right asserted, the magnitude of the imposition on that right, and the interests militating for and against any intrusion on privacy. (*Pioneer, supra*, 40 Cal.4th 360.)

█ The methodology for considering the intersection of privacy and discovery was recently articulated by the California Supreme Court in a related, though not identical, context in *Pioneer*. The specific question presented in *Pioneer, supra*, 40 Cal.4th 360, was whether to use an opt-out or opt-in notice for precertification discovery of potential class members in a putative class action suit—consumers who had complained that their DVD players were defective. In evaluating the discovery order, the court applied the framework set forth in *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 40 [26 Cal.Rptr.2d 834, 865 P.2d 633] (*Hill*), for evaluating invasion of privacy claims. First, a claimant must possess a "legally protected

privacy interest." (*Hill*, at p. 35.) Second, the claimant must have a reasonable expectation of privacy under the particular circumstances, including the customs, practices, and physical settings surrounding particular activities. (*Id.* at pp. 36–37.) Third, the invasion of privacy must be serious in nature, scope, and actual or potential impact. Trivial invasions do not create a cause of action. (*Id.* at p. 37.) If there is a reasonable expectation of privacy and the invasion of privacy is serious, then the court must balance the privacy interest at stake against other competing or countervailing interests, which include the interest of the requesting party, fairness to the litigants in conducting the litigation, and the consequences of granting or restricting access to the information. (*Pioneer*, at pp. 370–371.)

Wild Oats argues for a different analysis, contending that once the element of privacy is in the mix, information may not be disclosed unless the petitioners demonstrate a compelling need for the particular information and that the information cannot be reasonably obtained through depositions or from nonconfidential sources. Wild Oats relies on *Harding Lawson Associates v. Superior Court* (1992) 10 Cal.App.4th 7, 10 [12 Cal.Rptr.2d 538], apparently viewing it and similar decisions as establishing a test distinct from the privacy framework established by the Supreme Court in *Pioneer*, *supra*, 40 Cal.4th 360, and *Hill*, *supra*, 7 Cal.4th 1. The cases can be harmonized: In *Harding Lawson* and similar cases, the existence of a legitimate privacy interest and the fact that a serious invasion of privacy would result from the release of the information involved were both so facially apparent that the court did not need to belabor them with drawn-out analysis. For instance, in *Harding Lawson*, a litigant sought discovery of third party personnel files. (*Harding Lawson*, at p. 9.) With such an obvious privacy interest and the clear intrusion on the nonparties' employment records, it is hardly surprising that the Court of Appeal proceeded directly to analyze the balance of competing interests.

While we apply the framework from *Pioneer*, *supra*, 40 Cal.4th 360, we also note that salient distinctions exist between that case and the circumstances here. In *Pioneer*, the plaintiffs sought not just contact information, but the very identities of the affected individuals; here the witnesses' identities have already been disclosed. Moreover, the discovery in *Pioneer* was precertification discovery designed to identify members of the class rather than to locate percipient witnesses, although the Supreme Court did note that some number of the potential class members would also be witnesses. This procedural distinction explains why the opt-out letter outcome of *Pioneer* is not necessarily appropriate here: in *Pioneer*, the plaintiffs were looking for people who would want to participate in the lawsuit. As pursuing litigation is a voluntary activity, an opt-out letter that offered recipients the option of participating or declining to participate was appropriate. In contrast, a percipient witness's willingness to participate in civil discovery has never

been considered relevant—witnesses may be compelled to appear and testify whether they want to or not.

## II. *Application of Privacy Framework to the Discovery Request and Order*

We apply the *Pioneer* and *Hill* privacy framework here to petitioners' request for contact information for identified witnesses. The trial court ruled that to protect the privacy of the employees in their addresses and telephone numbers (their names and job titles had already been disclosed), an opt-in letter would be used by which the witnesses would have to consent to their contact information being disclosed to petitioners and to the fact of their consent being disclosed to Wild Oats. Implicit in this ruling is the factual determination that the witnesses entertained a reasonable expectation of privacy in their addresses and telephone numbers, that there would be a serious invasion of privacy from the disclosure of those addresses and telephone numbers unless an opt-in letter was used, and that in balancing the opposing interests the witnesses' privacy interest in their contact information either outweighed plaintiffs' interest in obtaining witness contact information or would not adequately be protected unless an opt-in system was employed. We review the trial court's order for an abuse of discretion. (*Pioneer, supra,* 40 Cal.4th at p. 371.) Certainly the trial court was well within its discretion in concluding that the witnesses had a reasonable expectation of privacy in their addresses and telephone numbers. We find, however, that the trial court abused its discretion in ruling that an opt-in notification system was required.

### A. *Legitimate Expectation of Privacy*

■ Wild Oats's current and former employees unquestionably have a legitimate expectation of privacy in their addresses and telephone numbers. "Courts have frequently recognized that individuals have a substantial interest in the privacy of their home." (*Planned Parenthood Golden Gate v. Superior Court* (2000) 83 Cal.App.4th 347, 359 [99 Cal.Rptr.2d 627] (*Planned Parenthood*).) In most if not all cases, the contact information was likely given by the employees to Wild Oats as a condition of employment. It is most probable that the employees gave their addresses and telephone numbers to their employer with the expectation that they would not be divulged externally except as required to governmental agencies or to benefits providers. This is a reasonable expectation in light of employers' usual confidentiality customs and practices. (See *Hill, supra,* 7 Cal.4th at pp. 36–37; *Pioneer, supra,* 40 Cal.4th at p. 370; *Belaire-West Landscape, Inc. v. Superior Court* (2007) 149 Cal.App.4th 554, 560–561 [57 Cal.Rptr.3d 197] (*Belaire*).)

The fact that we generally consider residential telephone and address information private does not mean that the individuals would not want it

disclosed under these circumstances. "While it is unlikely that the employees anticipated broad dissemination of their contact information when they gave it to [Wild Oats], that does not mean that they would wish it to be withheld . . ." (*Belaire, supra*, 149 Cal.App.4th at p. 561) from plaintiffs seeking relief for violations of employment laws in the workplace that they shared. Just as dissatisfied Pioneer customers could be expected to want their information revealed to a class action plaintiff who might obtain relief for the defective DVD players (*Pioneer, supra*, 40 Cal.4th at pp. 371–372), if any of the current and former Wild Oats employees are similarly situated to plaintiffs, they may reasonably be supposed to want their information disclosed to counsel whose communications in the course of investigating the claims asserted in this lawsuit may alert them to similar claims they may be able to assert.

■ Wild Oats asserts misuse of discovery because some employees whose names were provided to counsel in this manner in previous wage and hour suits filed against Wild Oats have become plaintiffs in later actions. The trial court, however, did not make any express findings of abuse, as it did not issue any statement of decision, nor is discovery misuse an implied finding necessary to the court's order.[3] Provided that counsel observes ethical rules in interactions with prospective witnesses, "[t]o the extent that plaintiff's attorney, on request, provides information to other claimants which causes them to 'recognize legal problems,' his [or her] behavior is laudable." (*Colonial Life & Accident Ins. Co. v. Superior Court* (1982) 31 Cal.3d 785, 795 [183 Cal.Rptr. 810, 647 P.2d 86] (*Colonial Life*).)

B. *Seriousness of Invasion*

On the second question, whether there is a serious invasion of privacy, *Pioneer* is instructive. While the trial court here implicitly found that a serious invasion of privacy would result unless an opt-in notice was used, we believe that conclusion is unsupported by facts or law. Here, just as in *Pioneer*, the requested information, while personal, is not particularly sensitive, as it is merely contact information, not medical or financial details, political affiliations, sexual relationships, or personnel information. (See, e.g.,

---

[3] Wild Oats claims that among the "Specific Findings" made by the trial court was the finding that "There was a concern 'about whether the plaintiffs are using discovery in this case for the purpose of trying to recruit plaintiffs for further lawsuits, in other words, whether this discovery device is being used to get more clients.' " What Wild Oats has omitted from its quotation is the fact that the trial court was asking a question, namely, *"Let me just ask this question: should I be concerned* about whether the plaintiffs are using discovery in this case for the purpose of trying to recruit plaintiffs for further lawsuits, in other words, whether this discovery device is being used to get more clients?" Wild Oats mischaracterizes the record, as this question cannot under any circumstance be considered a specific finding by the trial court.

*Pioneer, supra,* 40 Cal.4th at pp. 372–373; *Hooser v. Superior Court* (2000) 84 Cal.App.4th 997, 1004 [101 Cal.Rptr.2d 341].) This is basic civil discovery. These individuals have been identified by Wild Oats as witnesses. Nothing could be more ordinary in discovery than finding out the location of identified witnesses so that they may be contacted and additional investigation performed. (*Planned Parenthood, supra,* 83 Cal.App.4th at p. 359 [home addresses and telephone numbers are "routinely produced during discovery"].) As the Supreme Court pointed out in *Pioneer,* the information sought by petitioners here—the location of witnesses—is generally discoverable, and it is neither unduly personal nor overly intrusive. (*Pioneer,* at p. 373.) In some respects, the potential intrusion here is even less significant than that in *Pioneer,* because here the requested disclosure does not involve individuals' identities, which had already been disclosed by Wild Oats prior to the filing of the motion to compel. There simply is no evidence that disclosure of the contact information for these already identified witnesses is a transgression of the witnesses' privacy that is "sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." (*Hill, supra,* 7 Cal.4th at p. 37.)

■ Indeed, it is only under unusual circumstances that the courts restrict discovery of nonparty witnesses' residential contact information. Discovery may be prohibited where the information violates the right to privacy and is not necessary to the prosecution of the matter. In *Morales v. Superior Court* (1979) 99 Cal.App.3d 283 [160 Cal.Rptr. 194], the court concluded that while the discovery of names, addresses, and telephone numbers of persons with whom the plaintiff had extramarital affairs was relevant to the subject matter of the action, the compelled disclosure of that information would violate the participants' privacy rights and was not necessary to obtain a fair trial: a fair trial could be had by compelling the plaintiff to disclose whether and when he had extramarital affairs without giving the identities and contact information of the other participants. Obviously, that is not the case here, because the discovery is designed to identify witnesses rather than to establish facts about the existence of relationships. For Wild Oats to disclose whether it had employees and how many employees it had would not be adequate under these circumstances; petitioners need to talk to the witnesses.

Discovery may also be limited in the unusual circumstance of true danger. In *Planned Parenthood, supra,* 83 Cal.App.4th 347, a litigant sought to discover the names and addresses of staff and volunteers at a Planned Parenthood clinic. The trial court balanced the competing interests and concluded that the balance favored restricting access to their identities and contact information because of the "unique concerns" (*id.* at p. 363) of the "emotionally charged and often violent" (*id.* at p. 362) abortion debate; because the real party in interest and his counsel had previously engaged in protests at the homes of clinic workers (*id.* at p. 363); because disclosure of

the information could place the workers in physical danger (*id.* at pp. 362–363), and because the case was not ordinary civil litigation: "human experience distinguishes Planned Parenthood's staff and volunteers from potential witnesses in 'routine' civil litigation . . . ," explained the court (*id.* at p. 364). This, however, is routine civil litigation, and the invasion of privacy is not nearly as significant here. While we do not disregard the privacy interests at stake, as petitioners trenchantly observed, "the dangers of being 'outed' as individuals who work at a grocery store cannot be equated with the impingement of associational freedom likely to occur when, as in *Planned Parenthood*, the disclosure identifies the individual as assisting in the operation of an abortion clinic."

To the extent that the privacy invasion appears significant here, we believe that this is an artifact of the number of individuals involved. Consider a hypothetical in which a plaintiff propounds the same form interrogatory used here to a corner grocery store with 10 employees. Counsel for that grocery store takes the same course that Wild Oats did, choosing to list all 10 employees that worked with the plaintiff in response to the interrogatory. The plaintiff then seeks the addresses and telephone numbers of the 10 employees as requested in the interrogatory, and the grocery store refuses to disclose their contact information, citing privacy. We cannot imagine that any trial court would have entered a protective order requiring the plaintiff to use a third party administrator to send letters to those 10 employees informing them that they would have to consent in writing before counsel for the plaintiff could contact them. We cannot imagine a trial court entering a protective order at all under those circumstances, absent a finding of discovery abuse. Nothing is analytically different here—only the number of witnesses is changed. It appears that the large number of witnesses identified by Wild Oats, rather than the actual significance of the privacy invasion with respect to each witness, may have impacted the court's analysis. We, however, see no manner in which the mere numerosity of witnesses alters the underlying analysis of the seriousness of the intrusion on the witnesses' privacy rights.[4]

---

[4] We understand that Wild Oats may have elected for strategic reasons to overdisclose information in response to the interrogatory. We and the parties are cognizant that it is unlikely that all 2,600 identified witnesses actually possess relevant information about petitioners' duties and tasks performed on the job. Indeed, for some of these individuals, disclosure of their names and job titles may have been wholly unnecessary. Wild Oats conceded at oral argument that the list was overinclusive. However, Wild Oats has identified them as potential witnesses and no showing has been made for any individual witness that he or she has no relevant knowledge. Should any individual identified as a witness later feel that there has been an unnecessary invasion of his or her privacy, this will become an issue between the employee and Wild Oats, not the employee and petitioners.

## C. *Balance of Opposing Interests*

■ The Supreme Court held in *Pioneer, supra,* 40 Cal.4th at page 373, that when the court concludes that there is no serious invasion of privacy no balance of opposing interests is required. Like the *Pioneer* court, however, we perform that balance even though it is not strictly necessary and find that it reinforces our conclusion that the trial court abused its discretion in imposing an opt-in system. As a starting point, the fundamental public policy underlying California's employment laws is implicated here, suggesting that the balance of opposing interests tips toward permitting access to relevant information necessary to pursue the litigation. (*Belaire, supra,* 149 Cal.App.4th at p. 562.) Also at stake is the "general public interest in ' " 'facilitating the ascertainment of truth in connection with legal proceedings' " ' [citation] and in obtaining just results in litigation [citation]." (*Hooser v. Superior Court, supra,* 84 Cal.App.4th at p. 1004.) The individuals whose contact information is sought here have been identified as potential witnesses in response to written discovery. These current and former employees are potential percipient witnesses to the occupational duties of petitioners, the primary issue in this litigation, and as such their locations are properly discoverable. (§ 2017.010.)

Considering the "fairness to the litigants in prosecuting or defending the forthcoming" suit (*Pioneer, supra,* 40 Cal.4th at p. 374), the opt-in system imposed by the trial court significantly advantages Wild Oats by greatly increasing the likelihood that it will be able to "retain for its own exclusive use and benefit the contact information" (*ibid.*) of potential witnesses to petitioners' claims.[5] The trial court imposed no order preventing Wild Oats from using the addresses and telephone numbers of these individuals in preparing its case, creating an inequitable situation in which one party has access to all, or nearly all potential witnesses but the other party is dependent on the willingness of those witnesses to participate in discovery. The inequity is all the more stark when one considers that some number of these witnesses would need to be willing to volunteer to participate in litigation against their current employer.

Not only does the protective order advantage Wild Oats, it unnecessarily hamstrings petitioners in their conduct of legitimate discovery by making their statutory entitlement to percipient witness discovery entirely dependent on the unreviewable decision of third parties whether they are interested in participating. Generally, witnesses are not permitted to decline to participate in civil discovery, even when the information sought from them is personal or

---

[5] Indeed, the parties agree that in a prior wage and hour suit against Wild Oats in which approximately 1,535 opt-in letters were sent, only 29 individuals consented to the disclosure of their information.

private.[6] Compliance with subpoenas is not optional; if a witness receiving a subpoena wishes to resist it, the witness cannot merely opt out, but must make a motion to quash or modify that subpoena. (§ 1987.1.) Simple disobedience may be punished as contempt. (§ 1991.) When a subpoena is served seeking the personal records of a nonparty consumer under section 1985.3, the party seeking discovery is not required to obtain the consumer's affirmative consent to the release of those records. If the nonparty consumer wishes to object to the release of the records, he or she must "serve on the subpoenaing party, the witness, and the deposition officer, a written objection that cites the specific grounds on which production of the personal records should be prohibited." (§ 1985.3, subd. (g).) Similarly, when a subpoena is served that seeks the production of a nonparty employee's employment records, a nonparty employee contesting the release of those records must serve a specific, written objection on the subpoenaing party, the deposition officer, and the witness that articulates the grounds on which the nonparty employee contends production of the employment records should be prohibited. (§ 1985.6, subd. (f)(2).)

Here, in contrast, with the use of an opt-in letter no obligation is imposed on the witnesses to respond or to assert their privacy rights. If they take the easiest course—no action—then their silence is interpreted as denial of consent. As shown above, inaction is construed as consent in the context of attempts to discover far more sensitive information than addresses and phone numbers—consumer records (§ 1985.3), employment records (§ 1985.6), even the bank records in *Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652 [125 Cal.Rptr. 553, 542 P.2d 977], prior to the enactment of section 1985.3.

The cases relied on by Wild Oats in which home addresses and telephone numbers were not ordered to be disclosed are inapposite here because the nature of the intrusion and the surrounding circumstances were fundamentally different than those here, changing the analysis entirely. We have already distinguished *Planned Parenthood, supra,* 83 Cal.App.4th 347, and *Morales v. Superior Court, supra,* 99 Cal.App.3d 283, as they concerned a vastly more serious privacy intrusion with the possibility of danger and harassment of the abortion clinic staff in *Planned Parenthood,* and the revelation of information about the identities of nonparties involved in extramarital affairs that was not necessary to a fair trial, in *Morales. City of San Jose v. Superior Court* (1999)

---

[6] Exceptions to this general rule exist where the Legislature has accorded particular information a higher level of privacy protection. For instance, the Insurance Information and Privacy Protection Act (Ins. Code, § 791 et seq.) requires a written authorization before an insurance company may disclose personal information about an individual collected or received in connection with an insurance transaction. (Ins. Code, § 791.13.) This statute explains the authorization of an opt-in letter in a case in which such information was sought through discovery in *Colonial Life, supra,* 31 Cal.3d 785.

74 Cal.App.4th 1008 [88 Cal.Rptr.2d 552] concerned not the identification of witnesses in civil discovery but a newspaper's request under the California Public Records Act (Gov. Code, § 6250 et seq.) for public disclosure of names, addresses, and telephone numbers of those who had made noise complaints about a local airport. That decision considered not only different interests than those here—interests in open government and the principles underlying the federal Freedom of Information Act (5 U.S.C. § 552 et seq.)—but also it applied a different legal test than that here, because the California Public Records Act provided a mechanism for balancing the public interests in favor of and against disclosure to determine which public records are exempt from disclosure.

At least one of the cases cited by Wild Oats does not even involve a request for residential addresses and telephone numbers. The court in *Davies v. Superior Court* (1984) 36 Cal.3d 291 [204 Cal.Rptr. 154, 682 P.2d 349] held that in an action concerning a dangerous and defective condition of a highway, the Vehicle Code does not make confidential information about other accidents that does not include the identity of or identifying information about those involved in those other accidents. As the Supreme Court noted, with the petition for writ of mandate the petitioner sought government-generated reports based on information included in individual accident reports but did "not seek discovery of the accident reports themselves and we do not decide here the circumstances in which a person who was not a party to a traffic accident may have an interest sufficient to entitle him to review the reports themselves." (*Id.* at p. 295, fn. 4.)

In *Denari v. Superior Court, supra,* 215 Cal.App.3d at page 1496, a decision concerning preemption, the court stated without explanation that California privacy law "would support the denial of disclosure" of the names and addresses of people arrested and placed in a jail at the same time that the plaintiff was held in that jail. The plaintiff had sought the information because one of the holding cells at the jail was within sight or sound of the booking area where she claimed to have been injured by the use of excessive force by the police. (*Id.* at pp. 1491–1492.) *Denari* is different in at least three significant respects from the instant case. First, here, petitioners already have the identities of the individuals involved; they merely seek their contact information, unlike in *Denari*, where the identities of the arrestees were not already known. Second, in *Denari*, the plaintiff did not know if any of the people whose identities and contact information she sought were in fact witnesses, whereas here Wild Oats has already identified the employees as witnesses. Third, the privacy intrusion involved in disclosing the addresses of already identified employees of a supermarket is far less significant than the intrusion and potential embarrassment resulting from the release of the identities, addresses, and telephone numbers of people who were arrested and booked into a county jail. Compared to the present case, then, in *Denari* the

plaintiff had less justification for seeking the information and the consequences of disclosure were far more intrusive of an individual's right to privacy. To the extent that Wild Oats cited these cases to establish that individuals possess a right to privacy that generally encompasses residential addresses and telephone numbers, we completely agree with that proposition, but these decisions contribute nothing more to the privacy analysis here.

The trial court articulated no justification for placing in the hands of witnesses absolute and unreviewable veto power over petitioners' access to contact information to permit them to pursue legitimate discovery into their civil claims, and upon performing the appropriate privacy analysis we perceive no basis for affording these witnesses' addresses and telephone numbers protections in excess of those afforded to vastly more private consumer and employment records. Indeed, the *Pioneer* court observed that employing opt-in mechanisms to protect the constitutional right to privacy endangers the ability to prosecute socially important claims: "requiring an affirmative waiver from persons whose personal identifying information is sought by others could have potentially adverse effects in cases brought to redress a variety of social ills, including consumer rights litigation . . . ," it could override the statutory process of section 1985.3, and it could impede investigations and prosecutions of " 'consumer and investor fraud, elder financial abuse schemes, food and drug hazards, and breaches of consumer product warranty, health, and safety standards,' " as well as diminishing the effectiveness of consumer protection class action lawsuits. (*Pioneer, supra*, 40 Cal.4th at p. 374.)

This is not to say that the trial court was without the ability to enter a protective order limiting the dissemination of the witnesses' contact information: Certainly the trial court may require that the information be kept confidential by petitioners and not be disclosed except to their agents as needed in the course of investigating and pursuing the litigation. Moreover, should the trial court find that the record evidences discovery abuse warranting a protective order as to the manner and means of contacting witnesses, the trial court always retains the discretion to impose such an order. However, the procedure selected here, an opt-in letter, effectively gave more protection to nonparty witnesses' contact information than the Discovery Act gives to much more sensitive consumer or employment records. We are aware of no logic or authority that would justify such disproportionate protection of this private but under these circumstances relatively nonsensitive information. We therefore hold that requiring petitioners to secure affirmative consent to the disclosure of their contact information via an opt-in letter mechanism exceeded the protections necessary to safeguard the legitimate privacy interests in the addresses and telephone numbers of the witnesses, and as such was an abuse of discretion.

## DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its order allowing disclosure and contact only if the witness consents, and to enter a new order directing the disclosure of contact information for the individuals identified in response to Form Interrogatory No. 12.1. This order is without prejudice to petitioners seeking a further response to the form interrogatory that includes only those persons Wild Oats believes to have percipient knowledge. The order to show cause, having served its purpose, is discharged. Upon finality of this opinion, the stay of further proceedings in the superior court is vacated. Petitioners shall recover their costs pursuant to California Rules of Court, rule 8.490(m)(1).

Perluss, P. J., and Woods, J., concurred.